## AMENDED COMPLAINT

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

FILED

AUG 2 9 2022

AT_____ O'CLOCK
John M. Domurad, Clerk - Syracuse

| | |
|---|---|
| ANTONIO T. BALLARD ) Plaintiff(s) ) ) vs. ) ) Lucas Dutton ) Defendant(s) ) | Civil Case No.: 9:21-CV-1248(LEK/CF **BIVENS** **ACTION** |

Plaintiff(s) demand(s) a trial by: **XXXX**JURY _____ COURT   (Select **only** one).

Plaintiff(s) in the above-captioned action, allege(s) as follows:

### JURISDICTION

1. This is a civil action brought pursuant to *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics,* 403 U.S. 388 (1971). The Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 2201.

### PARTIES

2. a. Plaintiff: Antonio T. Ballard #21893-052

   Address: Butner Medium II

   Federal Correctional Institution

   P.O Box 1500

   Butner NC 27509

Additional Plaintiffs may be added on a separate sheet of paper.

3. a. Defendant: Lucas Dutton

   Official Position: Lieutenant

   Address: 128 Ray Brook road

   Ray Brook  N.Y 12977

b.   Defendant:   _____

Official Position:   _____

Address:   _____

_____

_____

c.   Defendant:   _____

Official Position:   _____

Address:   _____

_____

_____

Additional Defendants may be added on a separate sheet of paper.

4.                                              **FACTS**

Set forth the facts of your case which substantiate your claim of violation of your civil and/or Constitutional rights.  List the events in the order they happened, naming defendants involved, dates and places.

**Note:  You must include allegations of wrongful conduct as to EACH and EVERY defendant in your complaint.** (You may use additional sheets as necessary).

1. On the day of plaintiff arrival at the Federal correctional Institution (F.C.I) RayBrook, Plaintiff informed officer John Doe in a private setting that due to his sex offender status,as well as history of previous assualts in which plaintiff was stabbed in other facilities of the BOP, that he did not feel safe walking the RayBrook compound, a "Active Yard", due to his fear of foreseeable assualts most likely to reocurr due to his sex offender status. After John Doe inquired as to Plaintiff charge, John Doe informed plaintiff he would most likely be stabbed while on the compound. plaintiff immeadiatly informed this officerhe wished to request protective custody, and was instructed to talk to SIS about his concerns for safety.

2. Shortly after this encounter with John Doe , Plaintiff met with S.I.S and discussed his saftey concerns. Plaintiff informed these men that he did

(continued)

did not feel safe walking the Ray Brookcompound. Plaintiff expressed his concerns that he did not understand why he was designated to the active yard when he was recently writted from F.C.I Fairtone, and because he has been assualted and stabbed due his sex offender status, he was deeply concerned and feared that a stabbing was more likely to recurr. a concern now enhanced by officer John Doe confirmation he mostlikely would be stabbed.

3. These Two(2) S.I.S officers, both in agreement informed plaintiff that he could not just request protective custody services while at the Ray Brook facility, and then explained to plaintiff that there was a process implemented and practiced at this facility:

A. Plaintiff was to quarantine for a total of four-teen(14)days

B. After the two week quarantine period, Plaintiff would then have to refuse the compound, recieve a "Refusing A Direct Order" incurring a displinary report which would allow plaintiff to be placed in the special housing unit (SHU)

C. While in the SHU, Plaintiff would then have to see DHO, Plaintiff would then have to repeat this process twice more, which would then start the process of the investigation into plaintiff believed threat to his safety. **IF A THREAT** was verified plaintiff would be placed in for a transfer.**IF A THREAT** was not verified plaintiff would have to refuse the compound for a number of months untill he was place in for a transfer.

4. Now informed that in order to be protected from harm plaintiff would have to recieve a displinary report, which would result in his phone and commisary privilages suspended for a period of 3-6 months. Plaintiff believe his best position was to prepare for the worse and hope for the best. keeping his focus on assisting his counsel on his direct appeal on his criminal matter. Suck with a double edge sword of the implemented policies and consequences excerised at this BOP facility, Plaintiff decided his best option was to risk his safety and walk the Ray Brook compound in order to keep his phone and commisary privilages, to best assist his counsel on the direct appeal.

5. After the two week quarantine period, plaintiff was designated to NIagra B unit cell 135. Having had been previously assualted by Inmates in the NEW YORK car. Plaintiff decided to associate himself with inmates associated with the SOUTH car. On this day plaintiff was introduced to a inmate who introduced himself as "Guap"(prisoner #1 Chew). After a brief introduction prisoner #1 asked plaintiff if he was Straight?( did plaintiff assist the government in securing a conviction) plaintiff informed prisoner #1 that he did not assist the government in securing a conviction, but was accused of prostituting minor females, a crime he actually innocent of. Plaintiff informed Prisoner #1 that he had case law located on the computer that could be read in his defense. Plaintiff also informed Prisoner #1 that he did currently have his Pre sentence Investigation report(PSI) as well as his sentencing transcript

6. after directing Prisoner #1 to **UNITED STATES VS BALLARD** 727 f.ed. appx 6 (2nd cir 2018) Plaintiff provided Prisoner #1 with the PSI and sentencing transcript. During the shift change Prisoner #1 summond plaintiff to his cell(147). In a private setting Prisoner #1 expressed to plaintiff that he

-1-

[Prisoner #1] believed plaintiff ran his mouth too much and that plaintiff knew the females in his case were minors. Believing this prisoner logic was detrimental to his [plaintiff] health and safety, plaintiff became defensive and informed prisoner #1 that he [plaintiff] did not prostitute these female ,nor did he know their natrual ages when they were in his prescene. A fact that could be proven through the trial testimony of the minors themselves.

7. Prisoner #1 informed plaintiff that if such documents could be produced that plaintiff would be safe to walk the compound, but if plaintiff did not produce these promissed documents, he [prisoner #1] would assualt,beat and robb plaintiff of all his personal property and commissary. knowing that these documents could be produced plaintiff ended the conversation.

8. While on the compound Prisoner #1 introduced plaintiff to prisoner's #2("3rd"); #3("c"); #4("catfish"); #5("yatta"); #6("va"); #7("black"), all associated with the "south car" A few days after meeting these prisoners plaintiff was approache d by prisoner #2 and #3 who informed plaintiff they were aware plaintiff was a sex offender and to "make it easy on himself" and leave the compound before it was too late. these two prisoner then flashed prison styled shanks and walked away. Plaintiff informed prisoner # of the interaction, and was instructed to remain on the property, however he was to continue to work twords getting those documents. Plaintiff followed these instructions.

9. Prisoner #1 talked to prisoner's #7("gigsta") and prisoner #5 who also lived on the niagra B unit with plaintiff and chew. These two prisoner's were in agreement with "chew' decision. however, prisoner 2,3,4,6,& 7 were not and therefore a couple of meeting were called to discuss this issue.

10. Prisoner #2 instructed all prisoner pertaining to the south car to produce their paper work on the recreaction move. Believing Prisoner "chew' solved the conflict dealing with the prison styled shanks being pulled on him [plaintiff]. Plaintiff attended this meeting but did not produce his paper work, prisoner #2 did.

11. A day or two later prisoner #1 had a meeting with prisoner all associate with the "south car". In this meeting it was to be discussed if plaintiff would continue to be associated with the south car. during this meeting now believing a conflict was about to spill over because of his sex offender status, plaintiff decided it would be best that he not associate himself with the south car. and from this day plaintiff remained on "man time"( a nuetrul party in prison)

12. On August 13,2021, Plaintiff sent an electronic cop out to the Warden expressing a threat to his safety. in which he believed the quicker he got his legal documents the quicker the threat of prisoner #1 would diminish. Plaintiff also informed the warden(and under a disquised PREA claim) washington about his previous attempts to request protective services, and requested if he could not recieve his legal material that he be removed from the compound and transfered to a compound where he did not have to **worry** about his safety.[exhibit I]

13. Days after this electronic cop-out was submitted to the warden and washington, Plaintiff was called down to the lieutenant office. While in the lieutenant office, plaintiff was accussed of lying about the allegations

**made** in his electronic cop-out. Lt. John Doe then inquired as to whom was threating his life. Plaintiff being hopeful that all threats would be subdued when he presented the testimony of the female "victims" who exposes that plaintiff did not know the natrul age of the minor female. informed the Lt. Jon Doe that he been off his physchatric medication for a while and believed to be experiencing paranoia due to his non compliance with medication. This Lt then informed plaintiff that if he[plaintiff] was being threatened, to provide the names of the men responcible since his [plaintiff] safety was his duty and main concern. Believing if he cooperated with the compound staff, he would be labled a rat and would face future cosequences from prisoner in other BOP facilities, plaintiff assured this Lt. he was safe for now and returned back to general population. It is this plaintiff belief that he [plaintiff] was placed on the call out to pick up his propert Plaintiff informed prisoner #1 and Prisoner #8 ("Mcall") that he [plaintiff] would be recieving his property and would produce the promissed document's.

14. Prisoner "mcall" was supposed to review plaintiff documents because Plaintiff was never placed in a "south" cell and was placed in a cell ran by New York. Prisoner #9 was the "Shot Caller" for the New York car. being that palintiff was assualted by inmates in the New York car, Plaintiff believed it was in his best interest for Mcall to review the documents as he requested.

15. After recieving his property from R&D. Plaintiff immeadiatly tried to show prisoner #1 and prisoner #9 the testimony of the three(3) minor victim, that proved plaintiff did not know their natrual ages. Prisoner #1 read thes documents and instructed plaintiff to gather the rest of the documents and transcripts so he could produce it to the other South homies. Prisoner #9 refused to read these documents and stated that he wanted to read the entire transcript's. that night plaintiff provided Prisoner #9 the entire transcrip of thefirst trial proceeding. Unable to find all the pages to the secound trial transcript, plaintiff informed inmate Mcall that he was famish from searching through the bulk of legal papers and would continue to search the next day. Prisoner #9 accepted and informed plaintiff he needed to read the transcript of the first trial first. Plaintiff then returned to prisoner #1 explaining the same thing in which prisoner #1 agreed. Reminding prisoner #1 of his promiss made to him [plaintiff] in which no harm was to come to him , Prisoner #1 agreed and instructed plaintiff to get the entire documents ready so that he could present it to the other "south homies"(prisoner 2-8)

16. To plaintiff belief, on friday August 26,2021, after thourougly searchin through his property, plaintiff came to the conclusion that approx. five pages were missing from the secound trial transcript. trying to avoid problems and suspicion, plaintiff approached prisoner #9, to assure him, he [plaintiff] would be sending a email to the lawyer requesting he provide the missing pages. Prisoner #9 informed plaintiff that someone would be approaching plaintiff later on in the day. Believing things were now turning for the worse, plaintiff asked Prisoner #9 if the situation was now bad in which prisoner #9 informed plaintiff things were. Plaintiff immeadiatly requested that he and Prisoner #9 speak in private.

17. Prisoner #9 and plaintiff entered the cell where prisoner #9 returned th first trial trannscript. Prisoner #9 accussed plaintiff of knowing "AG" (a minor in plaintiff case) was six-teen years old. Explaing to prisoner #9 that the trial transcript and testimony supports he did not know "AG" age.

(continued)

Plaintiff pleaded with prisoner #9 that he only wanted to fight his case, an not to make any calls that would deter him [plaintiff] from doing this. Prisoner #9 expressed to plaintiff "he was not dealing with it and he [plaintiff] needed to find another cell by monday.

18. Plaintiff immeadiatly went to Prisoner #1 and expressed his concern and delima now at hand. Plaintiff once again pleaded with Prisoner #1 to keep his end of the bargin, because he provided the promissed documents and did not know the girls natrual ages. Prisoner #1 agreed, after explaining to thi prisoner the need to find a cell. Prisoner #1 became fustrated and expressed he would try to switch cells, but if the arrangement could not be made then plaintiff would have to leave the compound.

19. On Sunday afternoon plaintiff entered the officer office with a copy of the electronic cop-out sent VIA email to the warden ie. [Exhibit #1]. plaintiff requested that prisoner #1 be  present as he informed the housing officer [C.o Kegle] that he was requesting protective custody,  due to the reasoning he [plaintiff] was in fear of his life and safety. Plaintiff requested prisoner #1 to stand by and bear witness that he was not "snitchin on him.

20. Plaintiff request for protective services was denied by Lt. Rivers. minutes later plaintiff was called down to the Lt. office of the Ray Brook compound, where he [plaintiff] personally spoke to this Lt. who then clearly denied plaintiff protective services. Since plaintiff refused to give Prisoner #1 and Prisoner #9 names, Plaintiff was then sent back to the Niagra B unit where the unit officer Kegle watched very closely assuring nothing happened to plaintiff on the remainder of his shift.

21. During the 4pm count that day, Plaintiff cell door was unlocked and he was excorted back to to the Lt. office where he talked to a different Lt. Plaintiff then informed this Lt. he [plaintiff] was feeeling suicidal and was thinking about killing himself, Plaintiff was then placed on  constant observation after being stripped of all personal belongings and provided a smock

22. The next morning plaintiff spoke with Ms Maiwald of Physcology. Plaintif: expressed to this facility staff member his actual concern for his safety from others and not himself. Plaintiff expressed since his arrival on the Ray Brook compound he did not feel safe.  Plaintiff also informed this staff member that he was being forced to get out of the new york cell, and since there were no cells available on the Niagra B unit if it was possible he be moved to a different unit. Plaintiff expressed that he only wanted to fight his case. Ms maiwald contacted the unit counsler and manager who informed her [Ms. Maiwald] they were not switching plaintiff cell or unit. This staff member also informed plaintiff that if he provided the names  of the inmates he could be off the compound and transfered to another facility in approx. 2 months, However if plaintiff chose not to give up the names of the inmates it would take 6-8 months. Plaintiff explained to this staff member that he would give this propersition some thought. Plaintiff also expressed to this staff member he was no longer suicidal. Plaintiff was then taken off of constant observation. After recieving his [plaintiff] personal property plaintiff was excorted to the lieutenant office.

23. On the 29th day of August 2021, Plaintiff was discharged from "suicide

-4-

(continued)

Watch" where and when he met Defendant for the first time. Defendant informe plaintiff that he [defendant] was only providing plaintiff one oppertunity to recieve "protective custody", and if plaintiff did not provide the wanted names he was inquiring about, plaintiff would be returned back to general population, and if and when plaintiff needed to obtain the facility protection he [plaintiff] would be denied protection for the remainder of hi [defendant] shift.

24. Defendant then inquired as to whom the prisoner were that were pressing plaintiff for his paper work. Demanding plaintiff provide him [defendant] the names of prisoners or elese. plaintiff now in fear of being assualted an foreseeing further assualts occurring if he cooperated refused to provide names, but continued to express to defendant his life and safety was in jeopardy if he was returned to general population. Defendant became annoyed with plaintiff, and stated plaintiff was denying protective services due to his refusal to cooperate. Plaintiff in fear of being harmed if and when he returned to general population, informed defendant of his history of being victimized and suffering assualts due to his false conviction and sex offender status. defendant assured plaintiff he was well aware of his past vitimization, and vulnability of being a victim of further assualts if he was returned to general population, however if plaintiff did not provide him the requested information he sought, he would not provide plaintiff with the needed protection no matter how much he [plaintiff] required it. Plaintiff remain reluctant with providing the prisoner names, but instead continued to inform defendant his life was in grave danger and would like to request the facility protection and sent to the SHU to await a SIS investigation. Defendant informed plaintiff his oppertunity for for the facility protection was now closed, and if and when plaintiff requested protective services when he returned to general population he [defendant] would deny him. Defendant then gave plaintiff a Direct order to leave his office and return back to the Niagra B unit. Plaintiff then began to beg Defendant to place him in the SHU so he could wait the SIS investigation. Standing up from his desk Defendant grabbed the facility issued canister filled with detterant for prisoners. Defendant then in a yelling manner instructed plaintiff he wa beining giving a direct order to leave his office, Plaintiff now in fear of being sprayed turned and exited the Lt. Office in fear of his safety and life.

25. Plaintiff then returned back to the Niagra b unit, and was ordered by John doe (unit officer) to return his property that was currently in his [John Doe] office back to his assigned cell (cell 135). moments later prisoner #1 entered plaintiff assigned cell and stated plaintiff could not remain on the compound and needed to leave immeadiatly. Plaintiff now afraid for his life and safety attempted to bargin with prisoner #1, informing this prisoner that defendant was not providing him [plaintiff] protective services due to the reason plaintiff refused to give up prisoner #1 name. Prisoner #1 informed plaintiff he did not believe plaintiff claims. prisoner informed plaintiff that if officer john doe did confirm plaintiff claims then plaintiff could remain on the compound safely until monday morning.

26. prisoner #1 and plaintiff then approached John doe. Prisoner #1 in a ver threating and agressive manner informed john doe that plaintiff could not remain on the compound and would be subjected to physical harm if he did. this officer, plaintiff and Prisoner then entered the unit officer office John Doe then picked up the office phone and called the facility Lieutenant office. where he informed the lieutenant that plaintiff was requesting

-5-

(continued)

protective services. After responding "ok" to the order giving over the phone. John Doe ended the call.

27. John Doe then informed plaintiff he was being denied protective service Plaintiff then inquired as to whom this officer spoke to over the phone, in which john doe informed plaintiff that "Lt. Dutton stated that he gave you an oppertunity to recieve protective services, you denied it then, and he's denying you now". Prisoner #1 who was present during the phone call exited out of the officer office. plaintiff then informed john doe that he was being denied protective services because he refused to snitch. Plaintiff then pleaded with john doe to call defendant back in which john doe stated "He was not dealing with the Bull shit" and then gave plaintiff a direct order to exit his office. plaintiff abided and was forced to return to his cell.

28. moments later Prisoner #1 assualted plaintiff in his [plaintiff] assigned cell. Plaintiff immeadiately approached john doe and requested tha he now recieve protective services, and because of such previous denied requst for protective services he was subjected to being yet another victim of an assualt, due to his false sex offender status the unit was ordered to lock down by john doe and plaintiff was taken to medical where his sustained injuries was documented.

(END)

5.                              **CAUSES OF ACTION**

**Note: You must clearly state each cause of action you assert in this lawsuit.**

### FIRST CAUSE OF ACTION

Failure to protect: Defendant neglected to take the appropiate actions to prevent an assualt by fellow prisoners, when he failed to place plaintiff in the (SHU) to under go a S.I.S investigation to confirm or deny if the prisoners on the compound intended to cause plaintiff seriouse harm. in clear violation of BOP policies and proceedure

### SECOND CAUSE OF ACTION

Deliberate indiference: defendant deliberate indiference to plaintiff safety from other prisoner which resulted in physical altercation after his denial of plaintiff request to recieve protective services caused negligent infliction of emotional distress.

### THIRD CAUSE OF ACTION

Cruel and unusual punishment: with direct access to plaintiff history of assualts he suffered in other BOP facilities due to his Sex Offender status exposes defendant was aware plaintiff was valnurable to attacks from other prisoners his [defendant] denial ofplaintiff protection from harm is a 8th Amendment violation

## FOURTH CLAIM

Defendant denial of plaintiff right to be safe from harm from other prisone
is a direct violation of B.O.P policy 3420.11

## FIFTH CLAIM

Defendant denial of plaintiff request for protection caused negligent
infliction of emotional distress, trauma, bruising and soreness

## SIXTH CLAIM

Defendant direct access to plaintiff history of assualts suffered due to
his [Plaintiff] sex offender status, being informed by other facility staff
members plaintiff was being pressured due to his sex offender status his
[Defendant] denial of plaintiff protective services request due to plaintif
failure to cooperate with his demand toprovide the prisoner names exposes
defendant deliberate indifferences.

6.     **PRAYER FOR RELIEF**

**WHEREFORE,** plaintiff(s) request(s) that this Court grant the following relief:

compensatory damages($35,000.00); Punitive damages($75,000.00);

neglect infliction of emotional distress($20,000.00) Pro'se attorney fees;

court cost

I declare under penalty of perjury that the foregoing is true and correct.

DATED: _8·20·2022_

_ANTONIO T. BALLARD_

_Antonio T. Ballard._
Signature of Plaintiff(s)
(all Plaintiffs must sign)